## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **ANTONE CENNA SMITH,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:21-CV-01787-L-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

### <u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>

Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (the Act) should be **AFFIRMED**.

### I.        BACKGROUND

Antone Cenna Smith (Plaintiff) filed his applications for DIB and SSI on July 24, 2019, alleging disability beginning July 1, 2019. (doc. 18-1 at 252.)[2] His claims were denied initially on November 12, 2019, and upon reconsideration on March 3, 2020. (*Id.* at 151, 160). After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified at a hearing on January 8, 2021, which was held by telephone due to the "extraordinary circumstance" presented by the coronavirus pandemic. (*Id.* at 56.) On January 27, 2021, the ALJ issued an unfavorable

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

decision finding that Plaintiff had not been disabled from his alleged onset date of July 1, 2019, through the date of his decision. (*Id.* at 33-44.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on January 27, 2021. (*Id.* at 169-70.) The Appeals Council denied his request for review on May 28, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on September 21, 1963; he was 57 years old at the time of the hearing. (doc. 18-1 at 57, 252.) He had at least a high school education and could communicate in English. (*Id.* at 283, 285.) He had past relevant work as a minister of music, in personal protection services, and as a security supervisor. (*Id.* at 58-61.)

**B.  Medical Evidence**

On June 14, 2018, Plaintiff presented to Texas Lung Center, P.A. (Lung Center), for an initial evaluation for obstructive sleep apnea. (*Id.* at 424-25.) His blood pressure was 112/58, and he weighed 287 pounds, was 74 inches tall, and had a BMI of 36.84. (*Id.* at 425.) He was in no acute distress, had regular heart rate and rhythm, normal gait, and no cyanosis or clubbing. (*Id.*)

In August 2018, a lumbar computed tomography (CT) scan revealed lumbar spondylosis most prominent at L5-S1 with mild to moderate bilateral foraminal stenosis, but no evidence of significant canal stenosis or cerebrospinal fluid (CSF) block. (*Id.* at 770.)

On October 1, 2018, Plaintiff returned to Lung Center for a pulmonary function test (PFT), which revealed a "mild" restrictive defect without a bronchospastic component, normal lung volumes, and "mildly reduced" diffusion that improved when adjusted for alveolar volume. (*Id.* at

421.) A chest x-ray revealed lower thoracic scoliosis but no masses, infiltrates, or effusions. (*Id.* at 422.) Lung Center found that his inhaled bronchodilator was a "mild restrictive" defect, his lung volumes were in the lower normal range, the "spirometric restriction" was "likely functional", and airways resistance was normal. (*Id.*)

On March 15, 2019, Plaintiff presented to Lung Center for testing, including spirometry[3], chest CT scan and x-rays, and carbon monoxide diffusion. (*Id.* at 411-13.) He was in no acute distress, his physical examination was normal, and he had a positive response to the bronchodilator[4] in the small airways. (*Id.* at 412-13.) He reported that he was "doing okay" and his asthma was "not an issue". (*Id.* at 411-13.) Although he reported averaging 4 hours of sleep at night, data from his bilevel positive airway pressure (BiPAP) device showed that he slept between 4 and 10 hours in a 24 hour-period. (*Id.*) Lung Center concluded that his BiPAP device was working "well" for him even if "his lifestyle … [wa]s not conducive to rest." (*Id.* at 412-13.)

On July 2, 2019, Plaintiff presented to Parkland Health & Hospital System (Parkland) for a medication refill, and he complained of a cough. (*Id.* at 793-94.) He had normal chest effort and breath sounds, but he reported seasonal asthma that he treated with an inhaler. (*Id.* at 795-96.) On July 11, 2019, his hypertension medication was changed because his pharmacy did not carry it, and its dosage was adjusted to better manage his symptoms. (*Id.* at 793.) At a follow-up on July 26, 2019, Plaintiff reported compliance with his new hypertension medication, his blood pressure

---

[3] "Spirometry is a physiological test for assessing the functional aspect of the lungs using an objective indicator to measure the maximum amount of air that a patient can inhale and exhale." Yun Su Sim, M.D., et al., *Spirometry and Bronchodilator Test*, 80 Tuberculosis & Respiratory Diseases 105 (2017).

[4] "The bronchodilator test is a method for measuring the changes in lung capacity after inhaling a short-acting beta-agonist that dilates the airway." *Id.*. "When the bronchodilator response is positive, it suggests asthma in general." *Id.* at 111.

3

was 120/81, and he had no symptoms; he was instructed to stop taking it because it was not working and was causing the side effects of joint pain, headaches, and fatigue. (*Id.* at 791-92.) He was given a follow-up appointment and advised to keep a blood pressure log. (*Id.*)

In a telephonic visit on July 13, 2019, Parkland's Umara Usman, M.D. (Internist), advised Plaintiff to continue taking his blood pressure medications, instructed him on checking his blood pressure, and ordered an in-person visit for a blood pressure check. (*Id.* at 603, 693, 793.)

On August 28, 2019, Plaintiff presented to Parkland's emergency room (ER), complaining of mid sternal chest pain with respirations and shortness of breath that had worsened since it started a day earlier. (*Id.* at 775-77, 782-83.) He reported 8/10 pain, his blood pressure ranged between 151/77 and 172/79, and his hemoglobin A1c[5] level was 6.8, but his breath sounds were clear, and he was otherwise "well appearing". (*Id.* at 775-76, 789.) He felt relief after taking one nitroglycerin sublingual tablet in the ER, underwent an angiography[6] that revealed periesophageal and hepatogastric adenopathy (or swelling[7]), and was discharged in "good" condition with normal gait and station and no muscle tenderness. (*Id.* at 786-89.)

On August 30, 2019, Plaintiff completed a function report that stated he could no longer stand for "long" periods of time, walk "long" distances, or bend and lift "heavy" objects, and that his leg and back pain "constantly" woke him up during the night. (*Id.* at 297-304.) He had difficulty

---

[5] "Hemoglobin A1c also called HbA1c, glycated hemoglobin test, or glycohemoglobin, is an important blood test that provides an average over the past 2 to 3 months of blood sugar (glucose) control." *Diabetes Prevention and Control – Acronyms*, DPNH.nv.gov, https://dpbh.nv.gov/Programs/Diabetes/dta/Acronyms/ Diabetes_-_Acronyms (last visited Oct. 17, 2022).

[6] Angiography is a "[r]adiography of vessels after the injection of a radiopaque contrast material"; it "usually requires percutaneous insertion of a radiopaque catheter and positioning under a fluoroscopic control". *Angiography*, Stedmans Medical Dictionary, 2014.

[7] *See Adenopathy*, Stedmans Medical Dictionary, 2014.

putting on socks and shoes, tying his shoelaces, and washing his lower extremities, including calves, feet, and toes, but he could care for his hair, shave, feed himself, and use the bathroom. (*Id.* at 299.) Although he did not prepare his own meals, he could wash the dishes and fold clothes; he went out alone daily, either walking, driving, or riding in a car; and he went to church and the grocery store on a "regular" basis. (*Id.* at 299-301.) He was right-handed; his conditions affected his ability to lift, squat, bend, stand, reach, sit, kneel, climb stairs, and walk; he could walk a block and a half at a time and would need to rest for 30 to 45 minutes, but he did not use an assistive walking device. (*Id.* at 302-03.)

On September 10, 2019, Plaintiff returned to Parkland, complaining of hypertension. (*Id.* at 773.) He reported that his chest pain had resolved. (*Id.*) His constitutional, respiratory, cardiovascular, gastrointestinal, musculoskeletal, and neurological findings were negative, and his physical examination was normal, including in range of motion. (*Id.* at 774-75.) He weighed 304 pounds, had a BMI of 37.1 and "stable" blood pressure of 136/73, and was advised to continue his current medication. (*Id.*) He was re-started on medication for gastroesophageal reflux disease (GERD). (*Id.*)

On October 8, 2019, Plaintiff presented to Parkland Advanced Practice Registered Nurse and Family Nurse Practitioner Linda E. Kottoor (Nurse) to establish primary care. (*Id.* at 769.) He weighed 296 pounds and had a BMI of 36.1; his blood pressure was 167/86, and he had not taken his hypertension medication that day. (*Id.* at 769-70.) His HbA1c level was 6.8, and he was treating his diabetes only with diet and exercise. (*Id.* at 770.) He reported seasonal asthma that caused "intermittent" wheezing and coughing and required him to use an inhaler about 4 times per month; "on and off" shortness of breath that worsened with exertion, but no chest pain; lower abdominal

spasms and cramps; and constant chronic lower back pain that worsened with bending. (*Id.*) He reported past treatment, including physical therapy, injections, and nerve blocks. (*Id.*) Nurse assessed him with a cough and shortness of breath (but no wheezing), abdominal pain, and diarrhea (but no blood in stool or constipation); his physical examination was otherwise normal, except that he had lumbar tenderness with normal range of motion and no swelling. (*Id.* at 772.) She planned to consult a physician about his gastrointestinal symptoms and to consider a referral for his back pain, and she advised him again to undergo an echocardiogram, submit a copy of his sleep study reports, take his medication as recommended, and maintain a healthy diet and exercise program. (*Id.* at 772-73.)

In two virtual visits with Parkland on October 11 and 14, 2019, Plaintiff complained of morning sputum, shortness of breath, and/or intermittent cough. (*Id.* at 667, 767.) Nurse reviewed with him his recent test results, including the August 2019 angiography, which revealed periesophageal and hepatogastric adenopathy but did not warrant any further "work up". (*Id*) She requested medical records of a March 2019 spirometry and made a second social work referral for supplies for his BIPAP device. (*Id.* at 767.)

On October 15, 2019, Plaintiff submitted to a physical consultative examination by Vijaya Chintala, M.D. (Examiner). (*Id.* at 644-49.) Plaintiff's blood pressure was 186/82, and he weighed 297 pounds. (*Id.* at 646.) He complained of lower back pain since 2015, neck pain since April 2019, sleep apnea since 2010, gout since 2016, asthma since 2012, hypertension since 1996, neuropathy, and diabetes mellitus type 2, which he described as "prediabetes". (*Id.* at 644-45.) He reported "intermittent" but "sharp" lower back pain of 8/10 intensity that radiated down his right lower extremities, worsened with exertion, and presented with numbness and tingling; "throbbing"

6

neck pain of 6/10 intensity that radiated to his left shoulder and worsened with exertion; "frequent" gout flare-ups; and shortness of breath at rest. (*Id.*) Prior treatment included medication for his hypertension, gout, and back and neck pain; injections and physical therapy for his back; muscle and pain creams for his back and neck; inhalers for his asthma; and a BiPAP device for his sleep apnea. (*Id.*) He also reported he could walk half a block at most, stand 15 minutes at most, sit 30 minutes, lift 5 pounds at most, hold a coffee cup and skillet, sweep, and drive, but not squat, open a jar, button clothes, or lift weight overhead. (*Id.* at 645.) He had positive left straight leg raise and could not squat and get back up "without difficulty", but he did not use an assistive device; he could stand on his heels and toes with minimal support and bend and get back up without difficulty. (*Id.* at 646.) He also had intact sensation, 5/5 muscle strength in all areas, and normal gait, fine finger movements, and range of motion in upper and lower extremities. (*Id.*) Examiner recommended a lumbosacral spine x-ray and assessed him with hypertension with nephropathy, degenerative joint disease of lumbosacral spine and radiculopathy, peripheral neuropathy, asthma, gout, sleep apnea, and as pre-diabetic. (*Id.* at 647.) She opined that Plaintiff's ability to sit was unlimited, but his lower back pain and radiculopathy limited his ability to stand, walk, lift, and carry objects; she did not specify the level of restriction. (*Id.* at 646.) She attached to her consultative report an evaluation chart documenting his "range of joint motion" in degrees:

1. Back: 10/25 Extension, 60/90 Flexion
2. Lateral (flexion): 10/25 Bilateral
3. Neck: 30/60 Extension, 30/50 Flexion
4. Neck (lateral bending): 15/45 Bilateral
5. Neck (rotation): 50/80 Bilateral
6. Hip (backward extension): 15/30 Bilateral
7. Hip (flexion): 60/100 Bilateral knee flexed and extended
8. Hip (adduction): 10/20 Bilateral
9. Hip (abduction): 20/40 Bilateral
10. Knee (flexion): 100/150 Bilateral

11. Shoulder: 100/150 Left and right abduction, 10/30 Left adduction, 15/30 Right adduction
12. Shoulder: 100/150 Left and right flexion, 25/50 Left extension, 30/50 Right extension
13. Elbow: 100/150 Left and right flexion
14. Forearm (pronation-supination): [no abnormalities]
15. Ankle: 10/30 Bilateral inversion, 10/20 Bilateral eversion
16. Ankle (flexion-extension): 20/40 Bilateral plantar, 10/20 Bilateral dorsal
17. Wrist (radial, ulnar): [no abnormalities]
18. Wrist: [no abnormalities]
19. Thumb (MP joint): [no abnormalities]
20. Thumb (IP joint): [no abnormalities]

(*Id.* at 648-49.)

On October 17, 2019, Plaintiff again reported to Parkland that he had not received his BiPAP device supplies, including mask, filter, and tubing; he was assisted in ordering the supplies and informed about financial assistance. (*Id.* at 766.) In a virtual visit with Parkland on October 24, 2019, Plaintiff's orthopedic referral for his chronic lower back pain was denied upon review of his August 2018 L-spine CT scan. (*Id.*) He was advised to undergo physical therapy and "conservative" medications, as needed, and was referred to the Physical Medicine & Rehabilitation Clinic (Spine Clinic) for further evaluation; if his symptoms persisted, he would be scheduled for an MRI. (*Id.*) Plaintiff reported "multiple" concerns regarding his back and was scheduled for a visit the following week. (*Id.*)

On November 4, 2019, Plaintiff presented to Nurse at Parkland complaining of back pain and blood-tinged sputum and shortness of breath, but no cough. (*Id.* at 762, 764.) He reported pain that worsened with prolonged standing and walking and that radiated down his left leg and presented with numbness and tingling; he had decreased range of motion and tenderness in his lumbar back, but no swelling or edema, and an otherwise normal physical examination. (*Id.* at 763, 765.) His blood pressure was 147/75, and he had not taken his medication that day; he was almost

8

76 inches tall, weighed 299 pounds, and had a BMI of 36.5. (*Id.* at 763.) He was scheduled for an MRI, received another social work referral for BiPAP supplies, and was advised to schedule a spirometry and echocardiogram that had been missed, remain medication-compliant, and use a nasal spray. (*Id.* at 665.) Plaintiff received his BiPAP supplies days later. (*Id.* at 762.)

On November 8, 2019, state agency medical consultant (SAMC) Roberta Herman, M.D., completed a physical residual functional capacity (RFC) assessment based on a review of Plaintiff's record. (*Id.* at 86-109.) She noted that Plaintiff alleged disability based on the impairments of back problems, sleep apnea, gout, peripheral neuropathy, asthma, diabetes, high blood pressure, and headaches. (*Id.* at 86-87, 98-99.) She considered Plaintiff's diagnoses, activities of daily living, pain and other symptoms, medication and other treatments, and statements to medical sources, and she noted that there was no indication of a medical opinion from any medical source. (*Id.* at 92-95, 106-07.) She found that Plaintiff's alleged limitations were partially consistent with the evidence of record. (*Id.* at 95, 107.) She determined that he had the physical RFC to perform light work and could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; push and/or pull with no limits other than the lift and/or carry restrictions; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; balance, kneel, crouch, and crawl without limitation; frequently climb ramps or stairs; and only occasionally stoop or climb ladders, ropes, or scaffolds. (*Id.* at 93-94, 105-06.) SAMC Herman opined that Plaintiff could perform past work as a security officer supervisor as actually performed. (*Id.* at 96, 108.)

On November 26, 2019, Plaintiff presented to Nurse at Parkland for insomnia, left eye twitching, and shortness of breath. (*Id.* at 758-59.) He reported using a BiPAP device and an inhaler

9

twice per day. (*Id.* at 759.) His BMI was 35.8, his blood pressure was "improved but still elevated", he weighed 293 pounds, and he had a normal physical examination. (*Id.* at 759, 761.) He was assessed with chronic insomnia, shortness of breath, and essential hypertension (benign), given an optometry referral for his eye twitch and a behavioral health referral for his insomnia, and advised to follow a low sodium diet and keep his blood pressure below the 140/90s range. (*Id.*)

On January 8, 2020, an L-spine MRI revealed that Plaintiff had multilevel foraminal stenoses due to degenerative changes, "most notable" at L5-S1, where there was "severe" bilateral neural foraminal narrowing. (*Id.* at 750-51.) There was no significant central spinal canal stenosis throughout the L-spine, and L1-2 was unremarkable. (*Id.*)

On January 9, 2020, Plaintiff presented to Internist for a hepatitis C screening test. (*Id.* at 747, 845, 875, 882.) She noted his blood pressure of 146/90, BMI of 36.65, and weight of 301 pounds. (*Id.* at 845.) She prescribed gabapentin and methocarbamol, refilled his prescriptions, scheduled him for laboratory testing, referred him to the Spine Clinic, ordered a colonoscopy and an esophagogastroduodenoscopy (EGD), and gave him a 6-month follow-up. (*Id.* at 845-46.)

On January 21, 2020, Plaintiff completed a second function report. (*Id.* at 329-35.) He still did not cook his own meals, tie his shoes, put on his socks, or shower without assistance, because he was unable to stand for "long" periods and had "limited" mobility in bending, but he could care for his hair, shave, feed himself, use the restroom, do laundry, and fold clothes while sitting. (*Id.* at 329-30.) He was awakened by "burning" and "shooting" pain but could still go walking, driving, or riding in a car; he used a mobile cart to shop in stores once or twice a week and went to church on a "regular" basis. (*Id.* at 329, 331-32.) He had trouble in his ability to lift, squat, bend, stand, sit, kneel, and climb stairs, and he could walk 5 to 10 steps before needing to rest about 10 minutes

before resuming his walk. (*Id.* at 333.) His medication side effects made it hard for him to pay attention and follow written or spoken instructions, but he was able to finish what he started. (*Id.*)

On January 23, 2020, Plaintiff presented to Internist at Parkland for an influenza vaccination. (*Id.* at 898.) His blood pressure was 139/86, he had a BMI of 36.1, and he weighed 298 pounds. (*Id.*) She increased his gabapentin, continued his cyclobenzaprine and amitriptyline prescriptions, refilled his Tylenol #3 prescription, and referred him to the "pain clinic". (*Id.*) The same day, she completed a Medical Statement that stated in its entirety:

> [Plaintiff] is going through some current medical condition that limits his walking, prolonged standing, lifting heavy weights. He is currently, under care of his primary care provider, for ongoing symptoms & has been referred to special[]ty clinic as well.

(*Id.* at 853, 856.) Plaintiff underwent a colonoscopy and EGD on January 28, 2020, and a spirometry and bronchodilator study on February 6, 2020. (*Id.* at 907, 909.)

On March 3, 2020, SAMC Jeanine Kwun, M.D., completed a physical RFC assessment based on a review of Plaintiff's record. (*Id.* at 112-39.) She noted that he alleged disability based on the impairments of back problems, sleep apnea, gout, peripheral neuropathy, asthma, diabetes, high blood pressure, and headaches; he also alleged his conditions had "change[d]" on November 8, 2019, he had been in a lot of pain, and his leg used to shake while he slept. (*Id.* at 112-13, 127.) She generally affirmed SAMC Herman's RFC assessment, except she opined Plaintiff could frequently balance, stoop, kneel, crouch, and crawl, and occasionally climb ramps, stairs, ladders, ropes, and scaffolds. (*Id.* at 121-22, 135-36.) She considered additional medical evidence, including the findings of a March 2019 physical examination and an October 2019 consultative examination, and found that Plaintiff's alleged symptoms were partially supported by the evidence of record. (*Id.* at 122-23, 134.) SAMC Kwun affirmed SAMC Herman's finding as to Plaintiff's

11

ability to perform past relevant work. (*Id.* at 123-24, 138.)

On March 4, 2020, Plaintiff presented to Parkland for laboratory testing; he was informed that his 7.3 HbA1c level was indicative of prediabetes. (*Id.* at 1041, 1056.)

In a telephonic visit on April 3, 2020, Plaintiff complained of lower back pain and diabetes mellitus and asked Internist to complete a form for his disability application form. (*Id.* at 1013.) She ordered an electromyography (EMG)[8] that had been postponed due to the pandemic and gave him a 6-month follow-up. (*Id.* at 1013-14.) She also completed a Physical Assessment, which was a one-and-a-half-page checkbox and fill-in-the-blank questionnaire. (*Id.* at 944-45.) She opined that his symptoms would "frequently" be severe enough to interfere with the attention and concentration required to perform "simple" work-related tasks, and that his medication side effects of dizziness and drowsiness could impact his capacity for work. (*Id.* at 944.) He would need to recline or lie down longer than the typical two 15-minute breaks and a 30-minute lunch during an 8-hour workday and had the following functional limitations:

    a. Walk 10 city blocks without rest or significant pain
    b. Sit 1 hour in an 8-hour workday and never stand/walk
    c. Take unscheduled 15-minute breaks every 20 minutes during an 8-hour workday
    d. Never lift or carry in a competitive work situation; and
    e. Bilaterally reach, handle, or finger with no limitations.

(*Id.*) She diagnosed him with lumbar radiculopathy and chronic lower back pain and opined that he would likely miss work more than 4 times per month, and that his impairments were reasonably consistent with the symptoms and functional limitations. (*Id.* at 944-45.)

---

[8] "Electromyography (EMG) measures muscle response or electrical activity in response to a nerve's stimulation of the muscle. The test is used to help detect neuromuscular abnormalities." *Electromyography (EMG)*, HopkinsMedicine.org, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg (last visited Oct. 17, 2022).

In a telephonic visit with Internist on May 14, 2020, Plaintiff requested a medication refill and reported waking up that day with a lower back strain and discomfort that "he did not have before". (*Id.* at 1036-37.) He was already taking Flexeril and Tylenol #3 and was advised to continue his medication and apply heating pads or ice packs as necessary. (*Id.* at 1036-37, 1041.) He was assessed with midline lower back pain with sciatica, sciatica laterality unspecified, unspecified chronicity, and hypertension, unspecified type. (*Id.* at 1041.) In a virtual visit with Nurse on May 27, 2020, Plaintiff reported morning phlegm, new shortness of breath, some wheezing, and a cough, but no congestion. (*Id.* at 1045-46.) He reported using cetirizine and nasal spray daily but denied taking any medication for diabetes mellitus. (*Id.* at 1046.) He was prescribed azithromycin and benzonatate for his cough and advised to rest, use a humidifier, and increase his fluid intake. (*Id.* at 1051.)

On June 1, 2020, Plaintiff presented to Parkland for an EMG of the left L2 through S2 myotomes. (*Id.* at 1061, 1063.) He reported constant lower left extremity numbness, some shooting pain irradiating to groin area and lateral aspect of thigh but not past knee, occasional pain in calf and foot, "severe" episodes of back pain "[s]ometimes", and a "locked" back feeling. (*Id.* at 1064.) He was alert, oriented, and in no acute distress. (*Id.*) He had difficulty doing 10 single calf left leg raises but no difficulty on the right, and he demonstrated 4/5 muscle strength for left hip flexors, knee extensors, knee flexors, plantar dorsi, plantar flexors, and extensor hallucis longus, but 5/5 muscle strength in all right lower extremities' myotomes. (*Id.*) The EMG revealed "maintained" alignment and vertebral body heights, normal background bone marrow signal, "[u]nremarkable" L1-2, and the following "abnormal" findings:

L2-3: Right-sided facet arthrosis contributes to mild right foraminal stenosis.
L3-4: Disc bulge and right greater than left facet arthrosis result in mild bilateral neural

foraminal narrowing.
L4-5: A disc bulge with superimposed central disc protrusion and bilateral facet arthrosis result in mild bilateral neural foraminal narrowing.
LS-S1: A disc bulge with associated posterior osteophytes and bilateral facet arthrosis result in severe bilateral neural foraminal narrowing.

(*Id.*) He was assessed with chronic radiculopathy on left L5 (and "likely" on S1) and "meralgia paresthetica" on the left side and advised to follow up with Internist. (*Id.* at 1068.)

In a virtual visit with Parkland on July 6, 2020, Plaintiff reported his sleeping and depression symptoms were "better". (*Id.* at 1072.) On July 9, 2020, he presented to Parkland and complained of pain down the back of his left leg and numbness in the anterior lateral thigh, but he did not use an assistive device. (*Id.* at 1080.) His blood pressure was 141/80, and he weighed 296 pounds and had a BMI of 37.1. (*Id.*) He had intact bilateral upper and lower extremities but diminished sensation to the lateral femoral cutaneous nerve on the left leg. (*Id.* at 1081.) He was given a physical medicine and rehabilitation referral for injections, since he had received some relief in the past. (*Id.*)

Between mid-July 2020 and mid-October 2020, Plaintiff had four telephonic visits with Internist. (*Id.* at 998, 1086-91, 1108-13, 1117-23, 1143, 1200-05.) On July 16, 2020, he complained of a cough, was administered a test for the coronavirus, and was prescribed antibiotics in case he tested negative for the coronavirus. (*Id.* at 998, 1087.) On August 21, 2020, he reported hoarseness for weeks despite gargling and was referred to Parkland's ENT & Audiology Clinic (ENT Clinic). (*Id.* at 1008-13.) On September 30, 2020, he asked for a medication refill and complained of issues with swallowing solid foods. (*Id.* at 1117.) Internist ordered laboratory testing, continued his medications, restarted him on medication for GERD, and assessed him with diabetes mellitus without complication, hypertension, unspecified type, GERD, chest pain,

14

unspecified type, and gout, unspecified cause, unspecified chronicity, unspecified site. (*Id.* at 1122-23.) On October 16, 2020, Internist reviewed with Plaintiff his laboratory findings, including his 9.2 HbA1c level and his "[n]ewly diagnosed" diabetes mellitus, and he advised him on dietary modifications. (*Id.* at 1143, 1200-05.)

On October 15, 2020, Plaintiff presented to ENT Clinic and complained of a "raspy" voice and asthma-related breathing issues, but no pain and no hoarseness, although it had lasted two months. (*Id.* at 1185, 1188.) He reported using a BiPAP device. (*Id.* at 1192.) He had a normal physical examination and "strong voice" without hoarseness. (*Id.*) A "flexible laryngoscopy" revealed a mild interarytenoid pachyderma and left true vocal chord with a small lesion. (*Id.* at 1193.) He was assessed with intermittent hoarseness, allergic rhinitis, GERD, and left vocal cord lesion or lukoplakia; he was advised to eat smaller meals, avoid eating late in the day, maintain a healthy weight, and use saline rinses, Flonase, cetirizine, and a humidifier. (*Id.* at 1194.) An upper gastrointestinal x-ray was ordered. (*Id.*)

On October 30, 2020, Plaintiff presented to Parkland's Spine Clinic for an evaluation and treatment plan by Nasser Ayyad, DO (Pain Doctor), and David L. Eng, MD (Rehabilitation Doctor). (*Id.* at 1206, 1209-10.) They considered his past treatments, including medication, home exercises that he rarely completed due to pain, physical therapy a year earlier, and injections he last received in October 2018, that provided him with 60 percent relief for a few weeks. (*Id.* at 1211.) They also considered his medical records, including his June 2020 EMG that showed left chronic L5-S1 radiculopathy. (*Id.* at 1210, 1215.) Plaintiff reported burning, shooting, sharp back pain that had worsened over the past year, especially with climbing stairs and flexion; it radiated to the lower left extremity and presented with numbness and tingling that had also worsened in the

prior 4 or 5 months. (*Id.* at 1210-11.) He weighed 295 pounds, was 6 feet and 3 inches tall, and had a BMI of 36.1, a blood pressure of 149/82, and a 9.2 HbA1c level. (*Id.* at 1211, 1214, 1216.) He presented with numbness and tingling, tenderness to palpation notable at lower lumbar levels over midline and paraspinal muscles in the lumbosacral spine, an antalgic wide-based gait, an inability to walk on his heels or toes, limited muscle strength in the left lower extremity due to pain, diminished sensation in the left lateral thigh but no weakness or motor deficits, an otherwise normal physical examination, and an ability to do tandem gait. (*Id.* at 1210-11, 1214-15.) Plaintiff was assessed with chronic lower back pain with bilateral lower extremity radicular symptoms, more pronounced on the left, advised to lose weight, prescribed meloxicam on a limited basis, and advised he would have to lower his HbA1c level before he could be administered a transforaminal epidural steroid injection at the 1-month follow-up visit. (*Id.* at 1216-17.)

On November 16, 2020, Plaintiff's upper gastrointestinal x-ray was "unremarkable":

Pharynx: The pharynx is grossly unremarkable. No laryngeal penetration or aspiration.
Esophagus: Esophageal motility is unremarkable. No mucosal abnormality or filling defect. No obstruction, stricture, or diverticulum. No gastroesophageal reflux observed.
Stomach: No hiatal hernia. Normal configuration, contraction, and rugal pattern. No gastric outlet obstruction. No filling defect, ulcer, or mucosal abnormality.
Duodenum: Normal course and caliber. No duodenal ulcer. No diverticulum. Visualized proximal small bowel is unremarkable.
Other: A barium tablet was given and it passed through the esophagus without obstruction.

(*Id.* at 1219-20.) On November 30, 2020, laboratory testing found his HbA1c level had decreased to 7.8. (*Id.* at 1226.) In a virtual visit with Parkland's Spine Clinic on December 4, 2020, Plaintiff was advised to continue his home exercises "as tolerated", comply with his medication regimen, follow a diabetic diet, and submit to a transforaminal epidural steroid injection once it was scheduled. (*Id.* at 1164, 1242.)

16

C. **Hearing**

On January 8, 2021, Plaintiff and a vocational expert (VE) testified at a hearing before the

ALJ. (*Id.* at 57-85.) Plaintiff was represented by an attorney. (*Id.*)

### *1. Plaintiff's Testimony*

Plaintiff testified that he worked 6-hour days for Community Bible Church in 2018 and

2019, during which he sat up to 5.75 hours a day, walked up to a "quarter-hour" a day, and never

lifted. (*Id.* at 58.) While working as a security officer or supervisor, he did "a lot" of walking

(probably 6 hours) while making "rounds" throughout the complex, but he affirmed that his work

history report correctly indicated that he worked 8-hour days, walked 3.5 hours a day, sat 2.5 hours

a day, climbed 30 minutes a day, and lifted no more than 10 pounds. (*Id.* at 59.) For three or four

months in 2010, he sold HomePro security systems door-to-door. (*Id.* at 59-60.) For seven months

that same year, he worked 4-hour days at a personal protection and security business, Ameritex

Guard Services; he walked up to 2 hours, stood up to 1 hour, sat up to 1 hour, and never lifted. (*Id.*

at 60-61.) In that position, he supervised employees but did not have the authority to hire and fire.

(*Id.* at 61.) In 2008 and 2009, he worked as a part-time music director at Christian Outreach Center.

(*Id.*) Plaintiff worked 8-hour days as a supervisor at Securitas Security Services; he sat between

1.5 and 2 hours a day, stood and walked the rest of the day, and never lifted anything. (*Id.* at 61-

62.) He worked more than three months at Interface Security System. (*Id.* at 62.) He was not

working and did not think he had worked after July 1, 2019. (*Id.* at 63-64.)

Plaintiff took three kinds of hypertension medication, and his high blood pressure was

"under control", but "every now and then" it "spike[d] up some" due to pain. (*Id.* at 64.) He treated

his asthma with a corticosteroid inhaler once a day, and he used a rescue inhaler when it "flare[d]

up", "normally" once a day and twice a day if "it g[o]t bad". (*Id.* at 64-65.) He underwent a PFT that resulted in "mild" findings. (*Id.* at 65.) About two or three times a week, he got headaches that lasted between one to two hours due to the number of medications he took; he treated them by "sleep[ing] [them] off". (*Id.*) Plaintiff took Metformin[9], a diabetes medication, twice a day; he kept track of his blood sugar levels, and the levels had been "pretty good" over the previous "couple" months. (*Id.* at 66.) When his dosage of Metformin was increased to lower his blood sugar level, he was finally able to receive a back injection. (*Id.*) He had "sore" knees "a lot", so he avoided certain foods that would "flare [them] up" for one or two days; if the flare up was "too bad", he would get a steroid injection, but he had not needed one within the past 12 months. (*Id.* at 66-67.)

Plaintiff used to have neuropathy, or "shooting" and "shocking" pains that came and went and radiated from his hip down the side of one leg to the bottom of his foot, but the pain now radiated down the sides of both legs. (*Id.* at 68.) It presented with numbness, which he described as making his thighs and legs very sensitive to, and irritated by touch, including clothing. (*Id.* at 68-69.) He believed that his neuropathy was due to nerves in his back and not related to his diabetes. (*Id.* at 69.) A week earlier, his dosage of Gabapentin, a nerve pain medication, was increased from 600 milligrams in the morning and 300 milligrams at night, to 1,500 milligrams in the morning, evening, and night. (*Id.*) His last EMG study was on June 1, 2020. (*Id.* at 69-70.)

Plaintiff used a BiPAP device any time he slept to treat his sleep apnea; it was "working", and he had no remaining symptoms. (*Id.* at 70.)

Plaintiff's "main thing" was his back problem, which he linked to his work as a security officer, during which he used to carry "a lot" of things. (*Id.*) He had been told "not to worry" about

---

[9] Because Metformin upset his stomach, Plaintiff believed he had not adjusted to it. (doc. 18-1 at 67.)

his back, but it really hurt him, caused him "the most problems", made it hard for him to "get around and do things", and required his wife to help him to "a lot of things", including putting socks on him. (*Id.* at 70-71.) He was taking two or three different pain medications, including Tylenol and Codeine, three times a day. (*Id.* at 71.)[10] A week earlier, he had been referred to the pain clinic for injections in the "vertebras" due to shooting pain and sensitivity in his thighs. (*Id.*) He was advised that he would need surgery to stop the shooting pain if these conservative measures did not work. (*Id.* at 72.)

On a typical day after waking up, Plaintiff got up to do "some kind of movement" because sitting for "too long" hurt him; he ate breakfast, read a book, or called someone on the phone, but basically stayed inside the house all day. (*Id.*) He had a driver's license but did not drive due to "so much" pain medication; if he needed to go anywhere, he got a ride "mostly" from his wife, who did not work outside the home because she had been laid off due to the pandemic. (*Id.*) No one else lived with them, and their income came from his wife's unemployment benefits. (*Id.* at 72-73.) They had no yard to take care of and he did no household chores. (*Id.* at 73.)

On cross-examination, Plaintiff testified that he could walk at most 4 or 5 minutes before he needed to stop or sit down because he would "immediately" get a burning and shooting pain that made it "pretty" hard for him to continue; it worsened if he continued. (*Id.*) He could stand to prepare quick meals for that same amount of time, but no longer than that. (*Id.* at 74.) His back problems restricted his ability to lift anything heavier than a gallon of milk. (*Id.* at 73-74.) Plaintiff could sit at most an hour before he began to feel pain and had to move and "do something". (*Id.* at

---

[10] Plaintiff's attorney represented that Plaintiff had undergone at least two lumbar MRIs in 2018 and 2020. (doc. 18-1 at 71 (citing *id.* at 461, 1216, 1241.))

74.) He took "a lot" of pain medications that made him drowsy, so he had to lie down "quite often" during the day and fell asleep "periodically", which helped because he was not in pain if he was asleep. (*Id.* at 74-75.) He spent 5 to 6 hours a day lying down because 30 to 40 minutes after taking pain medication three times a day, he fell asleep for about an hour. (*Id.* at 75.) His pain medications made him "a little forgetful", and it was "hard" for him to stay focused even while reading a book or watching television because he would fall asleep. (*Id.* at 77.)

Although Plaintiff took a "couple" medications for depression and anxiety, neither had been "stabilize[d]", so he had been referred to a "higher" doctor. (*Id.* at 75-76.) His depression had worsened over time because he had been a "provider" who was "used to working all the time", but now he had to be "wait[ed] on" and helped with his socks. (*Id.* at 76.) After lying down, he could physically get up "on [his] own", but some days he did not "feel like getting up". (*Id.*) "[L]ately", he had about 3 or 4 bad days a week. (*Id.*)

Due to the pandemic and because he had "a lot" of underlying conditions, Plaintiff was "not really" in touch with family members and only spent time with his wife. (*Id.*) He could not climb stairs or bend at the waist; he could reach overhead but not with any weights. (*Id.* at 78.)

Plaintiff testified he was not using a cane, crutches, or any assistive device. (*Id.*)

### 2. *VE's Testimony*

The VE testified that Plaintiff had past relevant work as a security guard (DOT 372.667-034, SVP-3, customary/actually light work)[11], security supervisor or "chief guard"[12] (DOT

---

[11] DOT stands for the Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

[12] This job title corresponded with the first, fifth, and sixth jobs listed on Plaintiff's work history form. (doc. 18-1 at 80.)

372.167-014, SVP-6, customary/actually light work), music teacher (DOT 152.021-010, SVP-7, customary/actually light work), bodyguard[13] (DOT 372.667-014, SVP-3, customary/actually light work), and pastoral assistant, (DOT 129.107-026, SVP-6, customary/actually light). (*Id.* at 79-80.)

The VE considered a first hypothetical individual who had Plaintiff's age, education, and past relevant work and could sit, stand, and walk for 8 hours out of an 8-hour workday; lift and/or carry 20 pounds occasionally and 10 pounds frequently; occasionally climb ladders, ropes, scaffolds, ramps, and stairs; and frequently balance, stoop, kneel, crouch, and crawl. (*Id.* at 80.) The hypothetical individual could perform Plaintiff's past work and unskilled jobs, including cashier II (DOT 211.462-010, SVP-2, light), with 800,000 jobs nationally; bakery worker conveyor line with a quality control and no baking (DOT 524.687-022, SVP-2, light), with 230,000 jobs nationally; and small products assembler (DOT 706.684-022, SVP-2, light), with 100,000 jobs nationally. (*Id.* at 81-82.)

A second hypothetical person with the same limitations as the first, but who performed at the sedentary rather than light exertional level, could not perform any of the past work that Plaintiff had performed at the light exertional level. (*Id.* at 82.) There were no transferrable skills or jobs for an individual with Plaintiff's background. (*Id.*) He had SVP-6 security guard jobs but was not a director of police; he went to college for two years but did not study "protective services" or attend the police academy. (*Id.*) He also taught music, but he did it while standing, and individuals with no master's or doctoral degree in education would "usually" not have a "sit-down" job in that field. (*Id.* at 82-83.)

On cross-examination, the VE testified that the "only" time it would be "tolerable" for an

---

[13] This job title corresponded with the special security person for an executive. (doc. 18-1 at 80.)

individual to lie down or recline for 2 hours during the workday would "maybe" be with an SVP-7 job, where he could take a two-hour break and either work a longer day or come in earlier that day. (*Id.* at 83.) Such an arrangement would be "unacceptable" for "normal paid" jobs, like security guards, who are "assigned certain hours of the day" and have no time to lie down. (*Id.*) Because the DOT did not address lying down, her testimony was based on more than 30 years of experience in the field.

Employers' tolerance for absenteeism was a day and a half a month, which included coming in to work late and leaving early. (*Id.* at 84.) Because the DOT did not address absenteeism, the VE's testimony was based on information collected from employers across the country. (*Id.*)

## D. **ALJ's Findings**

The ALJ issued an unfavorable decision on January 27, 2021. (*Id.* at 44.) At step one, he found that Plaintiff had met the insured status requirements through December 31, 2023 and had not engaged in substantial gainful activity since the alleged onset date of July 1, 2019. (*Id.* at 35.) At step two, he found the severe impairments of degenerative disc disease of the L-spine, and the non-severe impairments of hypertension, asthma, diabetes, gout, obesity, obstructive sleep apnea, shortness of breath, chest pains, and depressive disorder. (*Id.* at 35-39.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 39.) He specifically considered Listing 1.04 relating to degenerative disc disease. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except he could frequently balance, stoop, kneel, crouch, and crawl, and occasionally climb stairs, ramps, ladders, ropes, and scaffolds. (*Id.* at 39.) At step

four, the ALJ determined that Plaintiff was capable of performing his past relevant work as a chief guard, bodyguard, and music teacher, as actually and customarily performed. (*Id.* at 43.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his alleged onset date of July 1, 2019, through the date of his decision. (*Id.* at 43-44.)

## II.        STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove

disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III.        MEDICAL OPINION EVIDENCE

Plaintiff presents one issue for review:

> The ALJ's RFC determination is not supported by substantial evidence and the product of legal error because he failed to properly evaluate the opinion of treating physician[,] [Internist], who performed the consultative exam at the agency's request.

(doc. 24 at 1.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." *Id.* §§ 404.1520c(a), 416.920c(a).[14]

---

[14] On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Plaintiff filed his application after the effective date, so the new regulations apply.

A medical opinion is a statement from a medical source about what the claimant can still do despite his impairments and whether he has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. *Id.* §§ 404.1513(a)(2), 416.913(a)(2).

The guidelines provide that the ALJ' determination or decision will explain how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b)(2), 416.920c(b). "The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted). Five factors are considered in evaluating the persuasiveness of medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors are supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a). Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support his own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See id.* §§ 404.1520c(c)(1), (2), 416.920c(c)(1), (2). The ALJ's determination or decision must explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). He

26

may, but is not required to, explain how he considered the remaining factors. *Id.*

When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). The ALJ evaluates the persuasiveness of the opinions when determining disability, and the sole responsibility for a disability determination rests with him. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

Here, Plaintiff claims that the ALJ's analysis of Internist's physical assessment is "legally erroneous" because he failed to properly evaluate and explain his analysis as required by 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). (doc. 24 at 7.)

Internist examined Plaintiff at least once in person in January 2020, visited with him by telephone 7 times between July 2019 and October 2020, completed a 2-sentence Medical Statement in January 2020, and provided medical opinions about his limitations in a Physical Assessment in April 2020. (doc. 18-1 at 603, 693, 747, 793, 845, 853, 856, 875, 882, 898, 944-45, 951, 973, 998, 1013, 1036-41, 1086-91, 1108-13, 1117-23, 1143, 1200-05.) Internist noted that Plaintiff complained of lower back pain in April 2020 and May 2020, and coughing, hoarseness, and swallowing issues in July 2020 through September 2020. (*Id.* at 747, 845, 875, 882, 998, 1108-13, 1087, 1117.) She prescribed, adjusted, continued, and/or refilled his antibiotic, blood pressure, GERD, and pain medication. (*Id.* at 603, 693, 747, 793, 845, 875, 882, 898, 998, 1036-37, 1041, 1087, 1122-23.) In January 2020, she stated that he was "going through some current medical condition that limit[ed] his walking, prolonged standing, [and] lifting heavy weights", was under

27

her care for "ongoing symptoms", and had been referred to "special[]ty clinic[s]". (*Id.* at 853, 856.) She assessed him with chest pain, GERD, and gout in September 2020; diabetes mellitus in July 2019, April 2020, and October 2020; and his hypertension in July 2019 and September 2020. (*Id.* at 1117, 1122-23, 1143, 1200-05.) She referred him to the "pain clinic" and Spine Clinic in January 2020 and the ENT Clinic in August 2020; scheduled him for a colonoscopy, EGD, and EMG; and advised him on dietary restrictions in October 2020. (*Id.* at 747, 845, 875, 882, 898, 1008, 1013-14.) She completed a medical statement in January 2020 and a physical assessment in April 2020. (*Id.* at 853, 856, 944-45.)

The ALJ considered Internist's April 2020 physical assessment, a one-and-a-half-page checkbox and fill-in-the-blank questionnaire, and her opinions that:

> [Plaintiff] could not lift any weight or stand or walk for any period in an eight hour work day .… [He] requires unscheduled breaks every twenty minutes for approximately fifteen minutes each .… [His] conditions were likely to cause him to miss work more than four times per month and would frequently interfere with the attention and concentration required to perform simple work-related tasks.

(*Id.* at 42 (citing *id.* at 944-45)) (internal citations omitted). No clinical, laboratory, or diagnostic evidence accompanied her assessment. The ALJ specifically found that Internist's opinion was "*not supported by* or *consistent with* treatment records" showing that Plaintiff "generally maintained his strength and sensation" during the relevant period, and it was also "*inconsistent with* findings" that he maintained a normal gait and stance despite his reported symptoms. (*Id.*) "Given the record as a whole", the ALJ expressly found that Internist's opinions were "not persuasive" because they were "overstated." (*Id.*) As discussed, the ALJ found that Plaintiff had the RFC to perform light work, except he could frequently balance, stoop, kneel, crouch, and crawl, and occasionally climb stairs, ramps, ladders, ropes, and scaffolds. (*Id.* at 39.)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R.
§ 404.1520c(c)(1)-(5), he specifically stated he considered the opinion evidence and prior
administrative medical findings in accordance with the requirements of 20 C.F.R. § 416.1520c,
and his decision reflects consideration of supportability and consistency, the two most important
factors in evaluating the persuasiveness of medical opinions. (*See id.* at 40.) He specifically
considered that Plaintiff's blood pressure had improved and was within the target range or was
elevated when he had not been medication-compliant. (*Id.* at 36 (citing *id.* at 761, 763, 769, 1080.))
He also considered Plaintiff's history of asthma; his complaints of coughing, shortness of breath,
and wheezing had been "conservatively" treated with inhalers and oral medications, and he had
been advised to use a humidifier and increase his fluid intake. (*Id.* (citing *id.* at 759, 761, 770, 793-
95, 798.)) While Plaintiff raised various conditions as a basis for disability, he testified in January
2021 that he managed his obstructive sleep apnea with a BiPAP device, treated his gout with a
healthy diet and had not required injections, had "pretty good" blood sugar levels in the prior
months and only occasional dizziness as a symptom, and treated his headaches with one or two
hours of rest and no medications. (*Id.* at 64-67, 70; *see id.* at 421.) While Plaintiff testified that his
"main thing" was his "shooting" back pain and numbness that radiated from his hips to his legs,
he had received a back injection a week before the hearing, had been referred to the pain clinic,
and was advised of surgery if "conservative" measures did not work. (*Id.* at 67-72.) The ALJ also
considered that Plaintiff's physical examinations revealed normal range of motion in his upper and
lower extremities, 5/5 strength, intact sensation, no motor deficits, and that he ambulated without
an assistive device in August 2019, October 2019, July 2020, and at the hearing in January 2021.
(*Id.* at 40-41 (citing *id.* at 646, 1080, 1210); *see id.* at 78, 302-03, 772, 774-75.)

The ALJ's reasons for discounting Internist's opinions in the April 2020 physical assessment, combined with his review and analysis of the objective record, satisfy his duty under the regulations. *See Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860, at *8 (N.D. Tex. Dec. 4, 2020) (finding that the ALJ's decision reflects he detailed the reasons why he found the overall evidence, including Dr. Pak's physical assessment, the objective medical evidence, and the course of treatment, unsupported and inconsistent with Plaintiff's subjective allegations of disabling limitation). Moreover, because Internist's opinions lacked accompanying diagnostic tests or specific clinical examinations, the ALJ could properly discount portions of her physical assessment as lacking substantive explanation. *See Fletcher v. Comm'r, SSA*, No. 4:21-CV-00173SDJCAN, 2022 WL 3130860, at *9 n.8 (E.D. Tex. June 21, 2022) (finding that the ALJ properly determined the persuasiveness of physician's two medical source statements "contain[ing] no information as to why the objective evidence supported the severity of the limitations indicated"), *report and recommendation adopted*, No. 4:21-CV-173-SDJ, 2022 WL 3107905 (E.D. Tex. Aug. 4, 2022).

Plaintiff appears to argue that the ALJ erred in finding Internist's opinions in the physical assessment "not persuasive" because they were "supported by her treatment notes". (doc. 24 at 7.) Internist's physical assessment did not cite to any treatment notes, however, and Plaintiff cited to only one of Internist's treatment notes for a virtual visit during which she did not examine him in person. (*See* doc. 18-1 at 944-45; doc. 24.) Additionally, none of Internist's treatment notes indicated the need for any functional limitations. (doc. 18-1 at 603, 693, 747, 793, 845-46, 875, 882, 898, 998, 1013-14, 1036-37, 1041, 1086-91, 1108-13, 1117-23, 1143, 1200-05); *see Ward v. Comm'r, Soc. Sec. Admin.*, No. 6:21-CV-00019-KNM, 2022 WL 3655220, at *16 (E.D. Tex. Aug.

23, 2022) (upholding the ALJ's finding that the internist's medical opinion statement was unpersuasive because it was not supported or consistent with the medical record and "*none* of her treatment plans indicated the need for any functional limitations") (emphasis added).

Plaintiff also argues that the ALJ erred by failing to identify the evaluations of the "medical specialists" who examined him on referral or to explain how Internist's opinions were consistent with their evaluations. (doc. 24 at 7.) Although he does not explicitly identify the medical specialists, he later references Examiner, Rehabilitation Doctor, and Surgeon. (*Id.* at 7-10.) His brief specifically states that Examiner examined Plaintiff "at the agency's request", Rehabilitation Doctor "documented reduced strength in the left lower extremity, diminished sensation in the left lateral thigh, and a wide-based antalgic gait with the inability to walk on either heels or toes", and Surgeon "noted reduced motor strength in the ankle dorsiflexors, in the long toe extensors, and in the ankle plantar flexors" and that "[s]ensation was diminished in the left lower extremity." (*Id.*) Plaintiff's "burden is not to highlight evidence contrary to the ALJ's ruling, but to show that there is no substantial evidence supporting the ALJ's decision", however. *Wendy M. B. v. Kijakazi*, No. 3:20-CV-02957-BT, 2022 WL 2704038, at *4 (N.D. Tex. July 11, 2022) (citing *Jones v. Saul*, 2021 WL 2895867, at *5 (N.D. Tex. July 9, 2021) (Ray, J.)).

To the extent that Plaintiff argues that the ALJ erred by not referencing Rehabilitation Doctor's "review" of the January 2020 MRI, (doc. 24 at 9), his decision specifically considered it as well as its findings that "[Plaintiff] had multilevel foraminal stenosis that was most notable at L5-S1, where there was severe bilateral neural foraminal narrowing", (doc. 18-1 at 41 (citing *id.* at 750)). Additionally, the ALJ did not err merely because he did not reference Rehabilitation Doctor's consideration of the January 2020 MRI; his decision expressly stated that he gave

31

"careful consideration of the entire record". (*Id.* at 35, 39); *see Hammond v. Barnhart*, 124 F. App'x 847, 851 (5th Cir. 2005) (stating that "there is no statutorily or judicially imposed obligation for the ALJ to list explicitly all the evidence he takes into account in making his findings").

Because the regulations require only that the ALJ "explain how [ ]he considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in h[is] determination or decision," he properly evaluated Internist's opinions in her physical assessment. 20 C.F.R. § 404.1520c(b)(2); *Williams v. Kijakazi*, No. 3:20-CV-3222-M-BH, 2022 WL 3045752, at *9 (N.D. Tex. July 6, 2022), *report and recommendation adopted*, No. 3:20-CV-3222-M-BH, 2022 WL 3042961 (N.D. Tex. Aug. 2, 2022) (citation omitted).

## IV.     RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 14th day of November, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE